# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| **TAMMY NOBLES**, an individual and as successor in interest to and representative of the Estate of Decedent Kayla Hamilton, **Plaintiff**, <br><br> vs. <br><br> **UNITED STATES OF AMERICA** **Defendant.** | Civil Action No. 4:25-cv-343 |

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF THE UNITED STATES' MOTION TO DISMISS</u>

This United States moved to dismiss this action for lack of subject matter jurisdiction based on three categories of arguments: (1) the discretionary function exception; (2) the independent contractor exception; and (3) the alleged lack of duty owed to plaintiff. The Federal Tort Claims Act's ("FTCA") discretionary function exception does not apply to Plaintiff's claims. Furthermore, the independent contractor exception also does not apply as Plaintiff's claims are all based on the United States' direct liability, not its vicarious liability for the acts or omissions of its contractor Compass Connections f/k/a BCFS Health and Human Services ("Compass Connections"). Lastly, the United States' argument that it owed no duty to Plaintiff's decedent is not only incorrect but also a premature attempt to have this court decide the instant action on the merits rather than on a jurisdictional basis. Accordingly, Plaintiff respectfully requests this court deny the United States' motion to dismiss in its entirety.

# TABLE OF CONTENTS

MOTION …………………………………………………………………..………….. 1

I.    RELEVANT FACTS & ALLEGATIONS …………………………………….………… 2

II.   STANDARD OF REVIEW …………………………………………………….……… 3

    A.  12(b)(1) Subject Matter Jurisdiction …………………………………………… 3

    B.  12(b)(6) Failure to State a Claim Upon Which Relief Can be Granted …………….. 5

    C.  Summary Judgment Standard …………………………………………………… 6

    D.  Discretionary Function Exception …………………………………………………… 6

III.  ARGUMENT ………………………………………………………………………...… 7

    A.  The United States is Subject to Civil Sanctions and Criminal Penalties for the
        Spoilation of Evidence ……………………………………………………...…… 7

        1.  Spoilation of Evidence ………………………………………………...... 7

        2.  18 U.S.C. §1519 ……………………………………………………….... 9

    B.  The United States Improperly Seeks to Challenge the Merits to Plaintiff's
        Claims and Ruling Should be Deferred …………………………………………… 9

    C.  The FTCA's Discretionary Function Exception Does Not Apply to Plaintiff's
        Claims ……………………………………………………………………........... 11

        1.  The Committee on the Judiciary and its Subcommittee on
            Immigration Integrity, Security, and Enforcement ……………………… 15

        2.  Border Patrol Did Not Have Discretionary Authority in How to
            Screen Martinez as a UAC …………………………………………… 16

        3.  Border Patrol Does Not Have Immunity for the Transfer of
            Martinez to ORR Custody ……………………………………………… 19

        4.  The discretionary function exception does not Bar Plaintiff's
            challenge to ORR's decision to release Martinez to a sponsor ………….… 19

        5.  The discretionary function exception does not apply to ORR's
            approval of Ms. D.C.M. as a sponsor ………………………………..... 21

        6.  The discretionary function to Plaintiff's negligent training and
            supervision claim ……………………………………………………..... 21

    D.  The FTCA's Independent Contractor Exception Does Not Apply to
        Plaintiff's Claims ………………………………………………………………... 21

    E.  The United States Owed a Duty of Care to Plaintiff's Decedent ………………..... 22

        1.  The United States admitted it owed a duty to Plaintiff's
            Decedent ………………………………………………………………… 23

        2.  The United States Owed a Duty to Plaintiff's Decedent
            because a special relationship existed ……………………………………… 24

        3.  Negligent Undertaking ………………………………………………… 28

IV.   CONCLUSION …………………………………………………………………… 29

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

# TABLE OF AUTHORITIES

## Cases

*ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir. 1987) …………………………… 14

*Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985) ……..…………12-13,15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) …………………………………………………… 5

*Bailor v. Salvation Army*, 51 F.3d 678 (7th Cir.1995) ……………………………………… 24-25

*Barry v. United States*, 667 F.Supp.3d 495 (S.D. Tex. 2023) …………………………………...24

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) …..……………………… 5

*Berkovitz v. United States*, 486 U.S. 531 (1988) ………..………………………………………… 12

*Boren v. Texoma Medical Center, Inc,* 258 S.W.3d 224 (Tex. App.2008) ……………………… 25

*Buchanan v. United States*, 915 F.2d 969 (5th Cir. 1990) ………………………………………...11-12

*Campos v. United States*, 888 F.3d 724 (5th Cir. 2018) …………………………………………… 7

*Carcamo–Lopez v. Does*, 865 F.Supp.2d 736 (W.D. Tex. 2011) ………………..13-14, 16-17, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) …………………………………………… 6

*Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195 (Tex. 1995) …………………………………24

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991) ……..…………………………………………... 7

*Childers v. United States*, 40 F.3d 973 (9th Cir. 1994) ……………………………...… 13, 16, 20

*Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116 (Tex 1976) ………….…………………………… 29

*Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191 (5th Cir. 2005) ………………………………... 7

*Couzado v. United States*, 105 F.3d 1389 (11th Cir. 1997) ………….……………………….. 15

*Cuvillier v. Taylor,* 503 F.3d 397 (5th Cir. 2007) …………...……………………………… 5

*El Chico Corp. v. Poole*, 732 S.W.2d 306 (Tex. 1987) …………………………………... 24-25

*Elephant Ins. Co. v. Kenyon*, 644 S.W.3d. 137 (Tex 2022) …………………………………… 24

*Estates of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St.3d 284 (1997) ………….. 24-25

*FDIC v. Meyer*, 510 U.S. 471 (1994) ………………………………………………………….6

*Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419 (5th Cir. 2005) …………………………...10

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

*Franklin Sav. Corp. v. United States*, 180 F.3d 1124 (10th Cir. 1999) …………..…………3, 4, 10

*Freeman v. United States*, 556 F.3d 326 (5th Cir. 2009) ………...…………………………........16

*Graff v. Beard*, 858 S.W.2d 918 (Tex. 1993) …………………………………………………... 25

*Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex.1996) …………………………… 25

*Greater Houston Transp. Co. v. Phillips*, 801 S.W. 2d 523, (Tex. 1990) ……...………….......... 23

*Guzman v. Jones*, 804 F.3d 707 (5th Cir. 2015) ………………………………………………..... 7

*Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex. Jul 06, 2021)
……………………………………………………………………………...…..12-13, 15, 19, 28

*Holt v. United States,* 46 F.3d 1000 (10th Cir. 1995) ……………..………………………… 4

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ………...……………………… 12, 15

*Jane Doe v. Covington County Sch. Dist.*, 278 Ed. Law Rep. 761 (5th Cir. 2012) …………… 24

*Johnson v. Sawyer*, 980 F.2d 1490 (5th Cir. 1992) ………...………………………………….13

*Johnson v. Sawyer*, 47 F.3d 716 (5th Cir. 1995) …………………………………………….....23

*Joiner v. United States,* 955 F.3d 399 (5th Cir. 2020) ………………………………………… 7

*Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F. 3d 841 (5th Cir. 2000) ………………………. 10

*Kerrville State Hospital v. Clark,* 900 S.W.2d 425 (Tex.App-Austin 1997) …………………… 25

*King v. Ill Cent. R.R.,* 337 F.3d 550, (5th Cir. 2003) ……...…………………………………….7

*Kristensen v. United States*, 372 F.Supp.3d 461 (W.D. Tex. 2019) …………………………… 28

*Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52 (Tex.1997) …...………………………………….24

*Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347 (5th Cir. 2005) ………………………… 6

*Lively v. United States*, 870 F.2d 296 (5th Cir. 1989) ………………………………………….. 12

*Logue v. United States*, 412 U.S. 521 (1973) ………………..………………………………… 22

*McCarty v. United States,* 929 F.2d 1085 (5th Cir. 1991) ……...………………………………….6

*Montez v. Dep't of Navy*, 392 F.3d 147 (5th Cir. 2004) …………………………………… 23

*Natural Gas Pipeline Co. of Am. V. Energy Gathering, Inc.*, 2F.3d 1397

(5th Cir. 1993) ………………………………………………………………………… 7

*New Mexican for Bill Richardson v. Gonzales,* 64 F.3d 1495
(10th Cir. 1995) ...……………………………………………………………… 4

*Osuna v. S.Pac.R.R.*, 641 S.W.2d 229, 230 (Tex. 1982) ……………………………………...28

*Otis,* 668 S.W.2d at 311 ……………………………………………………………...25-26

*Perreira v. State*, 768 P.2d 1198, 1209-16 (Colo. 1989) ……………………………………….. 24

*Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471
(5th Cir. 2002) ………………………………………………………………………… 6

*Ramming v. United States,* 281 F.3d 158 (5th Cir. 2001) ……………………………………….3

*Rimkus Consulting Grp., Inc. v. Cammarate*, 688 F.Supp.2d 598 (S.D. Tex. 2010) …………….8

*Ruiz v.* McDonald, 299 F.3d 1173 (10th Cir. 2002) …………………………………………….4

*Sanders v. United States*, 937 F.3d 316(4th Cir. 2019) …………………………….. 12-13, 15, 19

*SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539 (Tex. 2018) ………………………… 24

*SmithKline Beeacham Corp. v. Die,* 903 S.W.2d 347 (Tex. 1995) ……………………………...23

*Soldano v. United States*, 453 F.3d at 1145 …………………………………...… 12-13, 15-16, 19

*Stalik v. United States*, 247 F. 2d 136, 139 (10th Cir. 1957) …………………………………… 27

*Texas Dep't of Mental Health and Mental Retardation v. McClain*, 947 S.W.2d 694 (Tex.App-
Austin 1997) ……………………………………………………………………… 25

*Tex. Home Mgmt, Inc. v. Peavy*, 89 S.W.3d 30-33-34 (Tex. 2002) ………………………... 23-24

*Tippett v. United States*, 108 F.3d 1194 (10th Cir. 1997) ……………………………… 3, 4, 10

*Thomson v. Gaskill*, 315 U.S. 442 (1942) ………………………………………………… 4

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2001) …………………………….. 23, 28

*Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F. 2d 129 (5th Cir. 1987) ………….. 6

*United States v. Gaubert*, 499 U.S. 315 (1991) …………………………………………...12-13

*United States v. Moyer*, 674 F.3d 193, 207-08 (3d Cir. 2012) …………………………………... 9

*United States v. Orleans*, 425 U.S. 807 (1976) …………………………………………… 22

*United States v. Scott,* 70 F.4th 846 (5th Cir. 2023) ……………………………………… 9

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

*United States v. Wise*, 221 F.3d 140 (5th Cir. 2000) …………………………………………….. 7

*Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995) …………………………………………...12

*Warren v. United States*, 244 F.Supp.3d 1173, 1224 (D. N.M. 2017) ………………………12, 15

*Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005) ………………………14, 16, 20

*Williamson v. Tucker,* 645 F.2d 404, (5th Cir. 1981) …………………………………………...3- 4

*Wyatt v. Kaplan*, 686 F.2d 276 (5th Cir. 1982) …………………………………………………… 10

*Yanez v. United States*, 63 F.3d 870, 872 n.1 (9th Cir. 1995) …………………………………... 21

## Statutes

8 U.S.C. §1232(c)(2)(A) …………………………………………………...………2, 20

18 U.S.C. §1519 ……………………………………………………………………….9

28 U.S.C. §2680 ……………………………………………………….……..7, 11, 16, 19-20

28 U.S.C. §2671 ……………………………………………………………………... 21

## Other Authorities

Restatement (Second) of Torts § 319 (1965) …………………………………………...23-24

Restatement (Third) of Agency §7.05 (2006) ……………………………………………….. 22

## Rules

Fed. R. Civ. P. 8(a)(2) ………………………………………………………………….5

Fed. R. Civ. P. 12(b)(1) ……………………………………………….…….. 3-4, 10, 23

Fed. R. Civ. P. 12(b)(6) ……………………………………………………….4-5, 10, 23, 28

Fed. R. Civ. P. 56 ………………………………………………………………. 3-6, 10

## I.     RELEVANT FACTS AND ALLEGATIONS

This action arises out of the brutal murder and rape of Kayla Hamilton, Plaintiff's daughter, by Walter Javier Martinez ("Martinez") on July 27, 2022. ¶ 7. The United States acting through the Department of Homeland Security ("DHS") and Department of Health and Human Services ("HHS"), is liable for Ms. Hamilton's death because of the institutional failures and operational negligence of both entities via their employees. *Id.*¶ 8; ¶ 21. From the time that Martinez was allowed to enter the United States through the time he was convicted of Ms. Hamilton's murder, Defendant United States acted with operational negligence in failing to follow its own policies and protocols as they relate to an individual that entered the United States illegally. ¶ 8.a-d; ¶ 12; ¶ 25. This case highlights the institutional failures of Defendant in its treatment of unaccompanied minors. Had Defendant United States followed its own policies, Martinez would never have had the opportunity to murder Ms. Hamilton. ¶ 8.a-d; ¶ 12; ¶ 25. Policy dictated that Martinez, as an unaccompanied minor with a criminal history, be placed in a secure facility, not released. ¶ 25.

By the United States's own admission, Martinez claimed he left El Salvador to avoid membership in gangs and that he feared the gangs would harm him if he returned. Defendant's Ex. D. Ironically, that the time Martinez made these allegations to Border Patrol agents, he was an MS-13 gang member with a criminal background. **Ex. A**, Jud. Com. Report 5.23.23, P. 9 Ironically, he claimed to federal immigration authorities that he fled El Salvador to escape gang-related threats. Id.  Martinez's case file showed that on January 21, 2020 he had been arrested in El Salvador for "illicit association" with MS-13. Id. This fact was easily verified by law enforcement investigating Ms. Hamilton's murder by merely contacting El Salvadoran officials. Id at P. 2 Furthermore, in Martinez's own correspondence to a pastor in El Salvador following his arrest, Martinez admitted to being an MS-13 member, killing four people, raping two individuals, and committing theft countless times. **Ex. B** Translation of Martinez Letter 7.29.24. At the time Martinez crossed the border, he also had gang tattoos that easily would have placed DHS and HHS agents on notice of the danger he posed if released into the United States. **Ex A** Jud. Com. Report 5.23.23, P. 2 DHS did not sufficiently screen Martinez for potential gang affiliation or criminal history at the time of his apprehension – matters that went directly to a potential safety risk and in the implementation of policy related to where he should be housed. 8 U.S.C. §1232 (c).

Moreover, Defendant United States responsibility for Martinez did not end when released to a sponsor. Policy dictates that there be some oversight over this unaccompanied minor. However, this did not happen, allowing Martinez to escape from his sponsor, live on his own as a minor, and brutally murder and rape Ms. Hamilton. ¶ 25. Even if Defendant United States had assigned its duty to Compass Connections, a private entity who received funds from HHS through a Cooperative Agreement, that housed then discharged Martinez to a sponsor, it remained ultimately responsible for Martinez.

The Aberdeen Police Department Criminal Investigations Division investigated Ms. Hamilton's death. ¶ 11. The Aberdeen Police Department conducted the homicide investigation in conjunction with DHS, and U.S. Immigrations and Customs Enforcement. *Id.* These agencies and their employees also investigated Martinez as part of the homicide investigation. *Id.*

Moreover, Defendant's operational negligence continued in placing Martinez and not monitoring him before the murder. ¶ 27.

## II. STANDARD OF REVIEW

The United States has put forth three categories of argument in its Motion to Dismiss based on: (1) the discretionary function exception, (2) the independent contractor exception, and (3) the alleged lack of a duty owed to plaintiff. It will need to use different standards to address the jurisdictional arguments and the duty argument. Where the court determines that jurisdictional issues raised in a Rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under Rule 12(b)(6) or Rule 56. *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1129 (10th Cir. 1999); *Tippett v. United States*, 108 F.3d 1194, 1196 (10th Cir. 1997). Each standard is addressed in detail below.

### A. 12(b)(1) Subject Matter Jurisdiction

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001). *A* party may raise the defense of the court's "lack of jurisdiction over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). These motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction, or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Williamson v. Tucker,* 645 F.2d 404, 412-13 (5th

Cir. 1981); *Ruiz v. McDonald*, 299 F.3d 1173, 1180 (10th Cir. 2002).The Fifth Circuit has described the allowable scope of the district court's 12(b)(1) inquiry as follows:

[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction— its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Williamson*, 645 F.2d at 412-413.

Thus, when making a Rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends and may do so by relying on affidavits or other evidence properly before the court. *Id.*; *See also New Mexican for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir. 1995); *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir. 1995).

This means the district court is not limited to an inquiry into only undisputed facts. *Williamson,* 645 F.2d at 413. It may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction. *Id.* And the burden lies with the party invoking the court's jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442 (1942). The district court ultimately has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson,* 645 F.2d at 413.

Here, the United States has asked the court to consider facts and evidence outside the allegations in the complaint, including affidavits. Given the broad scope of the 12(b)(1) inquiry, the court may exercise its discretion to consider the immunity arguments under 12(b)(1) even though the plaintiff has not had an opportunity to conduct discovery. But the third argument—attacking the existence of a duty under Texas law—directly addresses the merits of the case. The court will need to look to Rule 12(b)(6) or Rule 56 to resolve this issue. *Franklin Sav. Corp.*, 180 F.3d at 1129; *Tippett*, 108 F.3d at 1196.

### B. 12(b)(6) Failure to State a Claim Upon Which Relief Can be Granted

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing *Twombly,* 55 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id* (quoting *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* (quoting *Twombly,* 550 U.S. at 558).

Here, the court may exercise its discretion to consider the duty argument under 12(b)(6) even though the plaintiff has not had an opportunity to conduct discovery. A plaintiff is "not entitled to discovery without a properly pleaded complaint." *Whitaker v. Collier*, 862 F.3d 490 at 502 (5th Cir. 2017); *See also Hollis v. Lynch*, 121 F.Supp.3d 617 at 646 (N.D. Tex. 2015). Should the court instead consider the argument as a motion for summary judgment under Rule 56, however, 56(d) will require the court to either defer judgment or deny the motion without prejudice pending discovery, as explained in more detail below.

### C. Summary Judgment Standard

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002).

Rule 56(d) contains a "safe harbor" provision that has been "built into the rules so that summary judgment is not granted prematurely." *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F. 2d 129, 136 (5th Cir. 1987) (referring to former Rule 56(f)). Under Rule 56(d), the court can "(1) defer considering the [summary judgment] motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order, provided the nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Rule 56(d) is "usually invoked when a party claims that it has had insufficient time for discovery or that the relevant facts are in the exclusive control of the opposing party." *Union Carbide Corp.*, 823 F.2d at 136. It offers relief where the nonmovant has not had a full opportunity to conduct discovery. *See McCarty v. United States,* 929 F.2d 1085, 1088 (5th Cir. 1991).

Here, should the court consider the duty argument under Rule 56, Rule 56(d) will require the court to either defer issuing a ruling or simply deny the motion. Plaintiff has not had any opportunity to conduct discovery and the United States has all the facts. The United States has even allowed evidence to be destroyed.

### D. Discretionary Function Exception

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, the terms of [the United States] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA serves as a limited waiver of sovereign immunity.

*Joiner v. United States,* 955 F.3d 399, 403 (5th Cir. 2020). However, this limited waiver is subject to numerous exceptions. 28 U.S.C. §2680. When any of the FCTA's exceptions to sovereign immunity are at issue, Plaintiff bears the burden to establish that the exception does not apply. *Campos v. United States*, 888 F.3d 724, 731 (5th Cir. 2018).

### III.    ARGUMENT
### A.  The United States is Subject to Civil Sanctions and Criminal Penalties for the Spoilation of Evidence

A person who destroys evidence may be subject to sanctions in a civil case and criminal prosecution.

#### 1.  Spoilation of Evidence

Spoliation "is the destruction or the significant and meaningful alteration of evidence." *Rinkus Consulting Grp., Inc. v. Cammarate*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010). A party's duty to preserve evidence arises when the party has notice that the evidence is relevant to a given litigation or should have known that the evidence may be relevant. *Id.* In regard to spoliation that occurs before a case is filed (but after such a duty attaches), federal courts may address such conduct through its inherent power to manage the litigation process. *Id.* at 611. Because "[t]he ultimate touchstone of inherent powers is necessity," [*Natural Gas Pipeline Co. of Am. V. Energy Gathering, Inc.*, 2F.3d 1397, 1412 (5ᵗʰ Cir. 1993] courts exercise such power with restraint. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991).

Available sanctions for spoliation in the Fifth Circuit include granting default judgment, striking pleadings, or giving an adverse inference instruction. *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005); *King v. Ill Cent. R.R.,* 337 F.3d 550, 556 (5ᵗʰ Cir. 2003); *United Staes v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000). But these sanctions may not be imposed unless there is evidence of "bad faith." [*Id.*]"Bad faith" generally refers to destruction for the purpose of hiding adverse evidence. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). Negligent destruction is inadequate grounds for a sanction. Ill. Cent. R.R., 337 F.3d at 556. A party seeking the sanction of an adverse inference based on spoliation must establish: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed, (2) the evidence was destroyed with a culpable state of mind, and (3) the destroyed evidence was

"relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Rimkus Consulting Grp.*, 688 F.Supp.2d at 615-16.

Here, sanctions should be imposed against the United States. On February 27, 2023, Representative Jim Jordan, Chairman of the House of Representatives Judiciary Committee and the Subcommittee on Immigration, Integrity, Security, and Enforcement, requested all case file materials for Martinez from DHS and HHS. **Ex. A** Jud. Com. Report 5.23.23, P.5. While DHS produced the file, HHS to this day has refused to do so citing Martinez's privacy rights. *Id.* HHS only allowed the committee and in camera review where the file was full of redactions that obscured important factual details and hampered the Committee's and Subcommittee's oversight. *Id. at 7.* This is prima facie evidence of the department's destruction of evidence which Plaintiff are entitled to see for claims against the United States. HHS for years has been hiding crucial evidence related to Ms. Hamilton's death. It has not only obstructed justice but destroyed crucial evidence.

Further showing HHS's destruction of evidence and culpable state of mind, on June 2, 2023, HHS held a bipartisan briefing in relation to an audit report that HHS prepared in response to press reports that it had lost contact with 85,000 UACs. **Ex. C** Jud. Com. Report 6.17.24, P. 10. During this briefing Committee staff inquired as to whether HHS had conducted an audit of Ms. Hamilton's case and was told that it had. *Id.* On June 8, 2023, the Committee conducted a transcribed interview with ORR Director Robin Dunn Marcos regarding UACs and Ms. Hamilton's case. *Id at 11.* At no time during her interview did Ms. Dunn Marcos state HHS had not conducted an audit. Instead, she claimed herself unable to answer many of the Committee's questions and said HHS attorneys would provide the Committee with the requested information at a later date. *Id.* at 13. HHS attorneys never produced the information prompting Chairman Jordan to send a letter to Ms. Dunn Marco on July 31, 2023. **Ex. D** Letter to Dunn Marcos. Meanwhile, on October 10, 2023 Plaintiff filed her notice of claim. Conveniently, after the Committee followed up regarding the audit in Ms. Hamilton's case, on November 8, 2023, after the United States had notice of plaintiffs' claims, HHS claimed no audit was conducted in Ms. Hamilton's case. **Ex. E** 12.20.23 email from Andrea Loving (Rep. Jim Jordan's aide) to Plaintiff; **Ex. C** Jud. Com. Report 6.17.24, P. 10-11. Since then, the Committee was forced to serve a subpoena on HHS to compel the production of the information it had requested. **Ex. F** 1.30.24

Email from Liz Slezak (employee of Rep. Jim Jordan's) to Plaintiff; **Ex. C** Jud. Com. Report 6.17.24, P. 13-14.

Here, the United States, specifically HHS is the party with control over the evidence related to Ms. Hamilton's murder and had an obligation to preserve it, but instead destroyed it. The evidence of an audit and other material from Martinez's case file were destroyed upon learning of plaintiff's allegations upon the filing of her notice of claim. The contents of Martinez's case file and HHS's audit are relevant to Plaintiff's claims against the United States and would support her claims. Therefore, sanctions should be imposed against the United States.

### 2. 18 U.S.C. 1519

Criminal law also punishes the destruction of evidence. Under 18 U.S.C. § 1519:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

Section 1519's language requires only that a criminal defendant "knowingly" alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry with the intent to impede, obstruct, or influence an investigation. *Id.; See also United States v. Scott,* 70 F.4th 846, 855 (5th Cir. 2023). The offense does not require that there be an ongoing investigation. And there is no materiality requirement. *Scott,* 70 F.4th at 855 (citing *United States v. Moyer*, 674 F.3d 193, 207-08 (3d Cir. 2012) "Materiality is not an express element of §1519."))

Here, while the United States is not a criminal defendant, its actions in obstructing justice and destroying evidence in related to Ms. Hamilton's murder should subject it to punishment.

### B. The United States Improperly Seeks to Challenge the Merits of Plaintiff's Claims and Ruling should be Deferred

The United States has put forth three categories of argument in its Motion to Dismiss based on: (1) the discretionary function exception, (2) the independent contractor exception, and (3) the alleged lack of a duty owed to plaintiff. Though framed as a challenge to subject matter jurisdiction, category (3) appears to directly attack the merits of the case. The United States has filed this motion before any discovery has been allowed to take place and after its refusal to

allow the deposition of former U.S. Secretary of Homeland Security Alejandro Mayorkas. As such, Plaintiff respectfully requests this court to defer issuing a ruling until the plaintiff has a chance to conduct jurisdictional discovery.

Whether the court addresses the motion now or later, it will need to use different standards to address the jurisdictional arguments and the duty argument. Where the court determines that jurisdictional issues raised in a Rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under Rule 12(b)(6) or Rule 56. *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1129 (10th Cir. 1999); *Tippett v. United States*, 108 F.3d 1194, 1196 (10th Cir. 1997). Each standard is addressed in detail below.

The district court has broad discretion on whether to permit a party to conduct jurisdictional discovery. *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982). A plaintiff is not entitled to conduct jurisdictional discovery without first making "a preliminary showing of jurisdiction." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005). To make this showing, the plaintiff must present "factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts." *Id*. In other words, the plaintiff must state what facts they believe discovery would uncover and how those facts would support personal jurisdiction. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F. 3d 841, 855 (5th Cir. 2000).

Here, discovery has the potential to uncover significant facts—the standard operating procedures (SOPs), or other relevant procedures, of the government agencies at issue. There is much unknown as to what happened when Martinez was apprehended at the border. Even ORR Director Dunn Marcos could not explain the policy or process DHS and HHS go through when they encounter an UAC. **Ex. C** Jud. Com. Report 6.17.24, P. 13. When asked by the Committee whether an UAC is asked if he/she has any gang affiliation, Dunn Marcos responded with,

> "I can't speak to all the questions that are asked and by whom. There's a number of different service providers for any given child." **Ex. C** Jud. Com. Report 6.17.24, P. 13-14.

The fact that the Director of ORR could not respond as to what the United States asks an UAC when apprehended goes directly to plaintiff's need to conduct discovery in this matter and at this

juncture. HHS has already denied the Committe access to Martinez's case file and Dunn Marcos refused to answer questions about practice and policies related to UACs.

Furthermore, as described in the previous section, the Committee requested Martinez's filed from HHS and it refused to produce it. As the Committee was entitled to this file for oversight purposes, so is Plaintiff. The United States holds all the cards here because it has DHS and HHS records but has not produced it to the Committee and Plaintiff has been prevented from conducting discovery to obtain them. **Ex. A** Jud. Com. Report 5.23.23, P. 5;7. Plaintiff is in the position of trying to prove subject matter jurisdiction without the opportunity to seek the evidence needed to meet its burden of proof. HHS cannot be rewarded for refusing to comply with the Committee and a legal subpoena.

Thus, the only way for Plaintiff to oppose the United States' immunity claims is for plaintiff to conduct written discovery and depose those agents and service providers that dealt directly with Martinez at the border from the time he was apprehended to being transferred to a sponsor. This is needed for plaintiff to fully and adequately oppose the United States' claims that it has immunity in its handling of Martinez.

As explained in more detail in the discretionary function exception section below, failing to abide by these procedures may subject the United States to liability under the FTCA.

Therefore, the court should allow plaintiff to conduct jurisdictional discovery.

## C. The FTCA's Discretionary Function Exception Does Not Apply to Plaintiff's Claims

The discretionary function exception preserves governmental immunity from suit under the FTCA for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. §2680(a)

This subsection contains two clauses beginning with "based upon" and separated by the disjunctive "or." These clauses set forth two separate exceptions to the FTCA. *Buchanan v.*

*United States*, 915 F.2d 969, 970-71 (5th Cir. 1990) (citing *Lively v. United States*, 870 F.2d 296, 297 (5th Cir. 1989)).The first clause, exempting actions mandated by statute or regulation, applies only if the actor has exercised due care. *Id.* The second clause, exempting actions based on a discretionary function, contains no due care requirement. *Id*.

To determine whether challenged conduct falls within the discretionary function exception, courts first examine "whether the challenged actions involve 'an element of judgment or choice.'" *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991); See also *Buchanan*, 915 F.2d at 970-71. The inquiry looks to "the nature of the conduct, rather than the status of the actor." *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). If a "federal statute, regulations, or policy" specifically prescribes a course of action, then the first clause applies, exempting actions only if the actor has exercised due care. *Buchanan*, 915 F.2d at 970-71. If the employee or agency fails to follow the prescribed course of action, or carries out the prescribed action in a negligent manner, the United States may be liable in tort. *Warren v. United States*, 244 F. Supp. 3d 1173, 1224 (D.N.M. 2017); ("Certain aspects of an investigation may be considered non-discretionary if officials fail to follow specific agency mandates or directives governing their conduct.); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985) ("It is true that negligent performance of (or failure to perform) duties embodied in federal statutes and regulations may give rise to a claim under the FTCA, but only if there are analogous duties under local tort law.); *Sanders v. United States*, 937 F.3d 316, 331–32 (4th Cir. 2019) ("This case turns instead on the NICS Examiner's alleged negligence in failing to follow a clear directive—contact the arresting agency—contained within the mandatory SOPs. The Government can claim no immunity in these circumstances."); *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex. Jul 06, 2021); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (". . . once it exercised its discretion to operate a light . . .  and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order.).

For example, in *Sanders*, the Ninth Circuit held that the discretionary function exception did not apply when the United States failed to perform a mandatory background check that resulted in a prohibited person obtaining a firearm. *Sanders*, 937 F.3d at 331-32. The court explained that such mandatory action did not involve judgment or choice—just an alleged failure to follow to follow the clear directive of contacting the arresting agency. *Id.* "The Government

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

can claim no immunity in these circumstances." Id. Likewise, in *Holcombe*, the district court for the western district of Texas reached the same conclusion when the United States allowed a prohibited person to make four separate firearm purchases. *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex Jul 06, 2021). The court explained that "[t]he Government could not offer any explanations for its agents' failure to perform these nondiscretionary functions" and, as a result, "failed to exercise reasonable care in performing its undertaking." *Id*. Courts have consistently held that a negligent performance of duties (or failure to perform) by the United States will give rise to a claim under the FTCA. *Id.; Sanders*, 937 F.3d at 331-32; *Art Metal-U.S.A., Inc.*, 753 F.2d at 1157.

In contrast, when an element of choice or judgment is involved, courts examine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23. The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 223. In other words, only those decisions "grounded in social, economic, and political policy" will be protected by the discretionary function exception. *Childers v. United States*, 40 F.3d 973, 974 (9th Cir. 1994). The Fifth Circuit in particular has urged courts to proceed with caution when making a determination that a decision is protected by the exception:

> [A]s virtually every act of a government employee involves at least a modicum of choice, we must exercise restraint when applying the discretionary function exception. If courts were not to exercise restraint, the government would be insulated "from nearly all tort liability," thereby frustrating the very purposes that motivated enactment of the FTCA-a classic example of the exception swallowing the rule. *Johnson v. Sawyer*, 980 F.2d 1490, 1502 (5th Cir. 1992).

Generally, day-to-day decisions made by government employees—merely executing the policy set by policymakers at high levels—are not protected by the exception. Gaubert, 499 U.S. at 336 (Scalia, J., concurring) ("The need for expedition vs. the need for safety may well represent a policy choice, but the Government does not expect its workers to make that choice on a case-by-case basis.") *Carcamo–Lopez v. Does*, 865 F.Supp.2d 736, 755–756 (W.D. Tex. 2011); *Soldano v. United States*, 453 F.3d at 1145–46.

Likewise, government decisions made for public safety generally do not involve "social, economic, and political policy." *Soldano v. United States*, 453 F.3d at 1145–46; *Carcamo–Lopez v. Does*, 865 F.Supp.2d at 755–756. As explained by the Ninth Circuit, "in particular, we have declined to find the discretionary function exception applicable where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations." *Id.* at 1146 (citing *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987). This is because "matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy." *Id.* at 1148 (citing *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th Cir. 2005).

For example, in *Whisnant*, the Ninth Circuit held that the discretionary function exception did not apply when the United States failed to clean up mold in the meat department of a commissary where the plaintiff worked. *Whisnant*, 400 F.3d at 1183. The court explained that "[c]leaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy." *Soldano*, 453 F.3d at 1150-51. In *Soldano*, the Ninth Circuit applied these same principles to determine that the exception did not bar a claim against a park service for negligently setting a speed limit. *Id.* The court explained that "the design of a course of government action is shielded . . . whereas the implementation of that course of action is not." *Id.* at 1148. This meant that the exception protected the design of the road from any claim of negligence, but not the decision to set an improper speed limit. *Id.* at 1150-51. And in *Carcamo-Lopez*, the district court for the western district of Texas held that the exception did not apply to a border patrol agent's decision to move an injured person to another location despite serious injuries. *Caracamo-Lopez*, 865 F.Supp.2d at 758.The court emphasized the Fifth Circuit mandate to proceed with caution when analyzing these decisions and explained that the border agent's decision was not "susceptible to policy analysis . . . but rather *only susceptible to general safety considerations*." *Id.* at 756. This type of "fairly routine" interaction does not require border patrol agents to "weigh the allocation of scare resources." *Id.* at 758. It was not the type of action the discretionary function exception was designed to protect. *Id.*

As a result, when a course of conduct is prescribed, the employee or agency must exercise due care. And when no statute, regulation, or policy prescribes a course of action, a

discretionary decision must involve "social, economic, and political" considerations to warrant immunity. Relevant here, the United States may not exercise discretionary immunity in the following circumstances: (1) when an employee or agency fails to follow a prescribed course of conduct, [*See i.e. Warren*, 244 F.Supp.3d at 1224; *Sanders*, 937 F.3d at 331-32] (2) when an employee or agency negligently follows a prescribed course of conduct, [*See i.e. Art Metal-U.S.A., Inc.* 753 F.2d at 1157; *Indian Towing Co.,* 350 U.S. at 69; *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex. Jul. 06, 2021) or (3) when an employee or agency makes a discretionary decision that is not grounded in "social, economic, and political policy," such as a decision made for public safety. *See, i.e. Soldano*, 453 F.3d at 1145-46; *Couzado v. United States*, 105 F.3d 1389, 1395-97 (11th Cir. 1997) (affirming the imposition of liability upon the government pursuant to the FTCA, because Customs agent's failure to divulge important information and to cooperate with the Drug Enforcement Agency in executing the controlled delivery negligently compromised passengers' and the crew's safety and proximately caused the plaintiffs' injuries.

The United States in its motion to dismiss conflates the separate clauses identified above and presents a confusing analysis that somehow immunizes the United States in every circumstance—whether an action is prescribed or not. But as explained above, this is not an accurate depiction of the legal standard. Each of the United States's arguments can be countered by pointing to one of the three circumstances above as a pathway to liability. More information (from jurisdictional discovery) would benefit this analysis. Plaintiff respectfully requests this court to consider the collective conduct of the agencies rather than singular acts.

### 1. The Committee on the Judiciary and its Subcommittee on Immigration Integrity, Security, and Enforcement

The Committee on the Judiciary and its Subcommittee on Immigration Integrity, Security, and Enforcement is charged by the House of Representatives with conducting oversight of federal immigration laws. As such, the Committee is empowered with the authority to oversee federal immigration laws. Following Ms. Hamilton's murder, it conducted an investigation into the handling of Martinez once apprehended at the border. It found the United States's conduct riddled with failures and that DHS's failure to perform even the most basic of measures to ensure individuals entering the United States are not dangerous led directly to Ms. Hamilton's murder.

**Ex. A** Jud. Com. Report 5.23.23, P. 2. The Committee admonished DHS and HHS for its insufficiencies; it did not overlook the United States's failures or at any time find enough was done.


## 2. Border Patrol did not have discretionary authority in how to screen Martinez as a UAC

The United States first argues that "Plaintiff does not identify any controlling federal statute, regulation, or agency policy that prescribed a specific course of conduct for Border Patrol's screening of Martinez for gang affiliation." *Motion to Dismiss* at 12-13. As a result, according to the United States, this was a discretionary decision that courts have long protected as an investigative decision. *Motion to Dismiss* at 14.

Without discovery, plaintiff has no way to know for certain that the United States did not have any policies in place governing border patrol's interactions with Martinez. However, taking the United States's assertions as true, this action (in a vacuum) should be analyzed under the second clause of 28 U.S.C. § 2680(a). Even if discretionary, the United States may not exercise immunity unless the decision was "grounded in social, economic, and political policy." *Childers*, 40 F.3d at 974. In the cases cited by the United States, the court determined that the investigative decisions made by law enforcement officers implicated "when, where, and how to allocate limited resources." *Freeman v. United States*, 556 F.3d 326, 340-41 (5th Cir. 2009). The United States has made no such argument here. And unlike those cases, resources do not appear to represent an issue here. Rather, this case involves a "fairly routine" interaction with a suspected alien, just like *Carcamo-Lopez*. Just as in *Carcamo-Lopez*, the border patrol agent here did not have to "weigh the allocation of scarce resources" during this brief interaction. The court should view this decision as a "matter of professional judgment" concerning safety like those made in *Whisnant*, *Soldano*, and *Carcamo-Lopez*. Such decisions are "rarely considered to be susceptible to social, economic, or political policy." *Soldano*, 453 F.3d at 1148 (citing *Whisnant*, 400 F.3d at 1183).

The decision on whether to allow Martinez to enter the United States was one based in safety and the danger posed, not a matter of social, economic, or political policy. Martinez posed a significant safety risk at the time he entered the United States, as was later evidenced by his

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

brutal murder and rape of Ms. Hamilton. Despite the need to ensure this individual did not pose a safety risk, DHS and HHS "failed to perform even the most basic of measures to ensure that the aliens entering the United States are not dangerous criminals or gang members." **Ex. A** Jud. Com. Report 5.23.23, P. 2 This blatant disregard for the safety of all Americans "directly resulted in the tragic and -sadly, preventable-murder of Kayla Hamilton. *Id.*

Martinez was an MS-13 gang member with a criminal background at the time he entered the United States. *Id.* Ironically, he claimed to federal immigration authorities that he fled El Salvador to escape gang-related threats. **Ex. A** Jud. Com. Report 5.23.23, P. 9. Knowing Martinez was from El Salvador who is overrun by MS-13 gang members, federal immigration authorities could have and should have vetted the truthfulness of Martinez's claim because it directly went to whether he posed a safety risk if allowed in the country. This was not discretionary as it tied directly to a safety issue. Martinez's case file showed that on January 21, 2020 he had been arrested in El Salvador for "illicit association" with MS-13. **Ex. C** Jud. Com. Report 6.17.24, P. 9. This fact was easily verified by law enforcement investigating Ms. Hamilton's murder by merely contacting El Salvadoran officials. **Ex. A** Jud. Com. Report 5.23.23, P. 2 Furthermore, in Martinez's own correspondence to a pastor in El Salvador following his arrest, Martinez admitted to being an MS-13 member, killing four people, raping two individuals, and committing theft countless times. **Ex. B** Translation of Martinez Letter 7.29.24. At the time Martinez crossed the border, he also had gang tattoos that easily would have placed DHS and HHS agents on notice of the danger he posed if released into the United States. **Ex. A** Jud. Com. Report 5.23.23, P. 2 However, as argued in its motion, the United States was not aware of these tattoos because it allegedly had discretion on how it conducted Martinez's screening and did not find it necessary to investigate whether Martinez posed a safety risk. *Id.* DHS did not sufficiently screen Martinez for potential gang affiliation or criminal history at the time of his apprehension – matters that went directly to a potential safety risk, not rooted in social, economic or political policy. The United States's screening of Martinez was a fairly routine matter for DHS and did not trigger the weighing of any factors or resources.

When the Committee interviewed Dunn Marcos, she admitted to being unaware of whether UACs were examined for gang tattoos despite the fact that UACs were required to have a medical examination done. **Ex. C** Jud. Com. Report 6.17.24, P. 11. If a medical examination

had been conducted of Martinez, even the most rudimentary exam would have revealed his MS-13 gang tattoos. Dunn Marcos was even unaware if the existence of gang tattoos, if seen, would be noted in a UACs file or elsewhere. *Id.* Even more egregious, Dunn Marcos was unaware if HHS puts any effort into determining if a UAC had a criminal record in the United States. *Id.* Dunn Marcos did confirm that HHS had the ability to contact a UACs consulate or embassy but would not do so for determine if a UAC has a criminal record in his/her home country. *Id at 12.* Discovery is needed to determine whether HHS ever called the consulate in regard to Martinez. Had HHS called the consulate for any reason, it would only have taken an extra 30 seconds to inquire about Martinez's criminal history. Therefore, the United States has the ability and does call a consulate for certain purposes, but fails to inquire as to whether a UAC has a criminal record to determine if the UAC poses a safety risk. Even during law enforcement's criminal investigation of Ms. Hamilton's murder, an ICE agent stated that he planned to contact El Salvador for information. Had that inquiry taken place here at the time Martinez was apprehended, federal immigration authorities would have easily discovered, as law enforcement later did, that Martinez had a criminal history and posed a significant danger and safety risk.

Further proof of this routine screening gone wrong, are the inconsistencies the Committee found in Martinez's case file:

- The person referenced throughout the file as his "first cousin," who the alien refers to as his aunt, is indicated to be a woman living in Maryland with multiple children. However, in one place on his file, this "first cousin" is also described as a male with no parenting experience.

- The case file notes the alien completed calls with "his father (sponsor)," which contradicts the consistent narrative the alien asserted throughout his file this his biological father had never been a part of his life.

- The case file notes that the alien had no siblings, but also that he had a half-brother. **Ex A** Jud. Com. Report 5.23.23, P. *7.*

The above inconsistencies show the United States's failures and signify red flags as to the dangerous propensity of Martinez who was clearly not being truthful.

Given the significant safety risk Martinez posed to Americans, the United States should have never released him. Defendant United States was required to place Martinez in a secure facility for criminal UACs rather than releasing him to a sponsor. **Ex. A** Jud. Com. Report 5.23.23, P. *6.*

### 3. Border Patrol Does Not Have Immunity for the Transfer of Martinez to ORR custody

The next argument focuses on border patrol's transfer of Martinez to ORR custody. According to the United States, border patrol "was mandated to transfer Martinez" and plaintiff's claims are therefore "barred by the discretionary function exception." Motion to Dismiss at 19.

As explained above, the mandatory nature of an action does not trigger the discretionary function exception. This argument should be analyzed under the first clause of 28 U.S.C. § 2680(a). The United States may still be subject to liability when it fails to exercise due care in carrying out a prescribed action. *Sanders*, 937 F.3d at 331-32; *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex Jul 06, 2021).

Again, without discovery, plaintiff lacks the benefit of pointing to any specific procedures that border patrol or ORR failed to follow when making the transfer. For instance, the United States may not have followed their SOPs, like *Sanders*. Without more facts, it is not possible to cite further evidence as to how the United States carried out this action with "operational negligence" or "operational failures." *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex Jul 06, 2021).

Nonetheless, despite not having access to all the supporting evidence, plaintiff can say the United States is subject to liability because it negligently transferred Martinez to ORR custody. Given Martinez's criminal background, MS-13 gang affiliation, and the safety risk he posed, Martinez should never have been released. **Ex. A** Jud. Com. Report 5.23.23, P. 6; **Ex. C** Jud. Com. Report 6.17.24, P. *9.*

### 4. The discretionary function exception does not bar Plaintiff's challenge to ORR's decision to release Martinez to a sponsor

The United States next argues that ORR made a discretionary decision when it released Martinez. According to the United States, "[t]he applicable statutes, regulations, and policies all

confer discretion upon ORR rather than prescribe a specific course of conduct." *Motion to Dismiss* at 23. Again, the United States appears to believe that a decision that involves any degree of discretion is subject to the discretionary function exception without the need to examine the nature of the decision.

Again, Plaintiff would benefit from being able to conduct jurisdictional discovery and seeing the release policies the United States references in the Motion to Dismiss. But as explained above, if discretionary, this action should be analyzed under the second clause of 28 U.S.C. § 2680(a).

The United States may not exercise immunity unless the decision was "grounded in social, economic, and political policy." *Childers*, 40 F.3d at 974. Here, again, "the design of a course of government action is shielded . . . whereas the implementation of that course of action is not." *Soldano*, 453 F.3d at 1150-51.And generally, a "matter of professional judgment" concerning safety is "rarely considered to be susceptible to social, economic, or political policy." *Id.* at 1148. The United States acknowledges that UACs are placed based on whether "the child poses a danger to self or others." *Motion to Dismiss* at 23 (citing 8 U.S.C. §1232(c)(2)(A)). Like the design of the road in *Soldano*, the policy decision to place dangerous children in a secure facility is a high-level decision grounded in social, economic, and political policy. But the implementation of that policy—deciding which children to place where—functions like the speed limit in *Soldano*. If the United States makes the wrong placement decision, or sets the speed limit too low, it is not protected by the discretionary function exception. The court should view this decision as a "matter of professional judgment" concerning safety like those made in *Whisnant*, *Soldano*, and *Carcamo-Lopez*.

As described in more detail in section "2", Martinez was an MS-13 gang member with gang affiliated tattoos and a criminal background at the time he entered the United States. **Ex.A** Jud. Com. Report 5.23.23, P. 9. Ironically, he claimed to federal immigration authorities that he fled El Salvador to escape gang-related threats. *Id.* Knowing Martinez was from El Salvador, which is overrun by MS-13 gang members, federal immigration authorities could have and should have vetted the truthfulness of Martinez's claim because it directly went to whether he posed a safety risk if allowed in the country. This was not discretionary as it tied directly to the implementation of a policy decision on whether to place Martinez in a secure facility. Given

Martinez's gang affiliation, he should have been placed in a secure facility for criminal UACs. However, the United States made a mistake in its implementation of the related policy and is not protected by the discretionary function exception.

### 5. The discretionary function exception does not apply to ORR's approval of Ms. D.C.M. as a sponsor

The United States next argues that the discretionary function exception applies to the decision to place Martinez with Ms. D.C.M. instead of another sponsor. The United States contends that Ms. D.C.M. was the "highest-ranked available sponsor" and ORR "complied with the applicable regulation." *Motion to Dismiss* at 26. The United States does not specify whether this was a mandatory or discretionary placement. But this argument appears to be moot as the Complaint specifically states that Martinez should have been placed in a secure facility, not sent to a different sponsor. Even if plaintiff had put forth this argument, the United States's position is once again incorrect. The United States could be held liable if it failed to take a prescribed action, negligently took a prescribed action, or if it made a discretionary decision that did not involve "social, economic, or political policy." Plaintiff would need to be allowed to conduct discovery to further refute this allegation put forth by the United States.

### 6. The discretionary function exception does not apply to Plaintiff's negligent training and supervision claim

The United States next challenges plaintiff's "claim" for negligent training and supervision. But the Complaint does not contain a cause of action for negligent hiring, training, and supervision. The only causes of action in the Complaint are (1) negligence and (2) wrongful death. This appears to be a moot argument.

### D. The FTCA's Independent Contractor Exception Does Not Apply to Plaintiff's Claims

The FTCA's limited waiver of sovereign immunity explicitly excludes "any contractor with the United States" from its definition of "[e]mployee of the government;" this is known as the independent contractor exception to the FTCA. 28 U.S.C. §2671. Courts have construed the independent contractor exception to protect the United States from vicarious liability for the negligent acts of its independent contractors. *Yanez v. United States*, 63 F.3d 870, 872 n.1 (9th Cir. 1995). "Since the United States can be sued only to the extent that it has waived its

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver." *United States v. Orleans*, 425 U.S. 807, 814 (1976).

The independent contractor exception, however, has no bearing on the United States's FTCA liability for its own acts or omissions. "Many cases recognize that it is not a defense, to liability for one's own negligence in connection with an actor whose conduct injured a third party, that the actor was not an agent or an employee," but rather an independent contractor. Restatement (Third) of Agency §7.05 (2006). Even where an employer has delegated some responsibilities to an independent contractor, the employer may still be held separately and directly liable for its own negligence. *See Logue v. United States*, 412 U.S. 521, 532-33 (1973). Only upon a finding that the government delegated its entire duty of care may the court dismiss the claim for lack of jurisdiction under the FTCA's independent contractor exception. *Id.*

Here, there is no question that Compass Connections is an independent contractor. But plaintiff does not seek to hold the United States vicariously liable for the acts of omissions of Compass Connections. Rather, plaintiff seeks to hold the United States directly liable for its failure to properly screen and house Martinez to account for his threat to public safety. Compass's scope of work with the United States did not encompass vetting a UAC at the border. It was not involved in the operational negligence committed by DHS and HHS. But for both DHS's and HHS' negligence in missing massive red flags associated with Martinez, Compass would not even have been involved. Furthermore, there is no hold harmless clause in the agreement between HHS and Compass, signaling against that HHS is precluded from contracting away its own negligence to a third party. If HHS truly believed it was shifting all of its liability to Compass, there would have been indemnity language in their agreement.

Again, Plaintiff seeks to hold the United States directly liable for its failure to properly screen and house Martinez to account for his threat to public safety, not for vicarious liability. Furthermore, Plaintiff relies on a duty of the United States that arose before Compass Connections identified Ms. D.C.M. as a sponsor. This exception, therefore, does not shield the United States from FTCA liability.

### E. The United States Owed a Duty of Care to Plaintiff's Decedent

The United States offers one last argument, asserting that it did not owe any duty of care to decedent and cannot be held liable for negligence. Though framed as a challenge to subject

matter jurisdiction, this is a challenge to the substantive merits of the negligence cause of action. Notably, the argument does not address the wrongful death cause of action. When a "jurisdictional attack [is] intertwined with the merits of an FTCA claim," resolving "the jurisdictional issue on a 12(b)(1) motion [alone] [is] improper." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). Instead, courts "must apply a 12(b)(6) or summary judgment standard to resolve issues dispositive of both subject matter jurisdiction and the merits." *Id. at 151.*

Texas law controls this analysis because "the liability of the United States under the [FTCA] arises only when the law of the state would impose it." *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995). The United States correctly asserts that Texas common law generally imposes no duty to prevent harm to others. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2001) (citing *SmithKline Beeacham Corp. v. Die,* 903 S.W.2d 347, 353 (Tex. 1995); Restatement (Second) of Torts §314 (1965) ("The fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.")). But this general rule does not apply when a "special relationship" exists between an actor and another Tex. Home Mgmt, Inc. v. Peavy, 89 S.W.3d 30-33-34 (Tex. 2002); *Greater Houston Transp. Co. v. Phillips,* 801 S.W. 2d 523, 525 (Tex. 1990). A special relationship does exist in the instant matter.

### 1.  The United States Admitted it Owed a Duty to Plaintiff's Decedent

The Committee is charged with conducting oversight of federal immigration laws.

Following Ms. Hamilton's murder, it investigated the failures of federal immigration authorities that interacted with Martinez. In its May 23, 2023 report of its findings, the Committee states that the government has a duty to ensure the safety and security of all American people, such as Ms. Hamilton. **Ex. A** Jud. Com. Report 5.23.23, P. *1.* This duty the Committee goes on to explain is a duty to enforce U.S. immigration laws and adequately secure U.S. border. Id. The Committee further determined that a "tragic example" of the failure to enforce U.S. immigration law is Ms. Hamilton's death. *Id.*

## 2. The United States Owed a Duty to Plaintiff's Decedent because a Special Relationship Existed

Under Texas law, to establish a negligence claim, a plaintiff must show: (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d. 137, 144 (Tex 2022). The general rule against imposing a duty to control the conduct of others does not apply when a special relationship exists between an actor and another that imposes upon the actor a duty to control the other's conduct. *Peavy*, 89 S.W.3d at 33-34; *Phillips*, 801 S.W.2d ta 525. Such relationship has been found between employer and employee, parent and child, jailers and inmates, and the state and foster care children. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Jane Doe v. Covington County Sch. Dist.*, 278 Ed. Law Rep. 761, 856 (5th Cir. 2012); *Barry v. United States*, 667 F.Supp.3d 495, 506 (S.D. Tex. 2023).

"[W]hether a 'special relationship' exists is not an issue reducible to an elemental test." *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 547 (Tex. 2018). When determining whether to impose such a duty as a matter of law, a court considers: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations. Peavy, 89 S.W.3d at 33-34. Courts must analyze foreseeability in terms of the known danger and the ability to control the third party's conduct. *Id.* at 38 (citing *Bailor v. Salvation Army*, 51 F.3d 678, 684 (7th Cir.1995); *Estates of Morgan v. Fairfield Fam. Counseling Ctr.*, 77 Ohio St.3d 284 (1997) ("[I]t is within the contemplation of the Restatement that there will be diverse levels of control which give rise to corresponding degrees of responsibility."); *Perreira v. State*, 768 P.2d 1198, 1209-16 (Colo. 1989) (scope of duty should be commensurate with the defendant's degree of control and the extent of the danger); *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53-54 (Tex.1997) (duty is "commensurate with the right of control")).

If the party in charge of the dangerous person knew or *reasonably should have known* of the dangers that person posed, then persons foreseeably exposed to such danger may be owed a duty of care. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995) (one in control of premises has duty of care to protect invitee from known, unreasonable, and foreseeable risk of criminal acts by third parties).

Texas adopted this approach from the Restatement (Second) of Torts § 319 (1965):

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm. *Id.*

One may also be liable for the acts of a third person when he or she has superior knowledge of a particular risk that the third person poses. *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 289–290 (Tex.1996) (council that knew of allegations of sexual molestation had duty to exercise care in recommending person as scoutmaster); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 314 (Tex.1987) (alcohol beverage licensee owes duty to general public not to serve alcohol to person it knows or should know is intoxicated).

Texas courts have long recognized this duty. For example, in *Otis*, the Texas Supreme Court held that employers who exercise control over an incapacitated employee owe a duty of reasonable care to third parties who are at risk of injury from that employee. *Otis*, 668 S.W.2d at 311. The court explained that "[s]uch a duty may be analogized to cases in which a defendant can exercise some control over a dangerous person when there is a recognizable great danger of harm to third persons." *Id.; See also Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993) (stating right to control is factor in determining duty. And a person may be liable for the acts of another person when he or she has superior knowledge of a particular risk the other person poses. *Otis*, 668 S.W.2d at 311; *El Chico*, 732 S.W.2d at 314; *Texas Dep't of Mental Health and Mental Retardation v. McClain*, 947 S.W.2d 694, 697 (Tex.App-Austin 1997). Likewise, in *Kerrville State Hospital v. Clark*, the parents of a woman murdered by her estranged husband while he was on outpatient commitment at a state hospital sued for wrongful death. 900 S.W.2d 425, 436 (Tex.App-Austin 1997) (rev'd on other grounds, 923 S.W.2d 582 (Tex. 1996). The court of appeals held that the state hospital took charge of the patient when it permitted his voluntary commitment and, as such, had a duty to use reasonable care in its release of the patient. *Id.* And in *Peavey*, the Texas Supreme Court held that a medical care facility owed a duty when it released a violent resident who later murdered a stranger at a convenience store. *Peavy*, 89 S.W.426, 436

The United States points to *Boren v. Texoma Medical Center, Inc.* as an analogous case, but this reliance is misplaced. 258 S.W.3d 224 (Tex. App.2008). Unlike the cases above, the medical center in *Boren* lacked control over the patient, and the murders were not foreseeable.

The assailant in *Boren* walked out of the hospital before the hospital obtained the right to detain him. Id. 226-227. And, as explained by the court when distinguishing the case from *Peavey*, the evidence "negate[d] foreseeability" because the record contained no evidence that the assailant "exhibited behavior dangerous to others or expressed any homicidal ideation, any threat to injure others, or any specific threat to injure his family or his wife's family." *Id.* at 230. For those reasons, the medical center owed no duty to prevent harm by the assailant. *Id.*

Here, the court will consider: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy considerations. The relationship favors imposition of a duty. As a UAC at the border, the United States had a similar degree of control over Martinez as a jailer has over an inmate—a recognized special relationship. And the United States placed Martinez with a sponsor, just like the state places children in foster care—another recognized special relationship. Likewise, similar to *Otis*, *Kerrville*, and *Peavey*, the harm here was reasonably foreseeable. While exercising control over Martinez, the United States should have learned that Martinez posed a danger to others given his membership in MS-13, gang affiliated tattoos, and criminal history. Unlike *Boren*, the United States had Martinez under its control and had the ability to learn of the danger he posed. The only remaining factor, public policy, should also favor imposition of a duty. To prevent future harms like the one that occurred here, the United States should be held accountable.

While the United States argues that no special relationship existed between it and Martinez, and that it had no duty following Martinez's release to a sponsor, this is simply not true. The United States's duty continued even after Martinez was placed with a sponsor, analogous to when a state placed a child in foster care. The Committee's May 23, 2023 report found that, "The surge of illegal aliens has resulted in the Biden administration's inability to adequately keep track of aliens, including UACs," and that calls to UACs and their sponsors are not happening as frequently as they should. **Ex. A** Jud. Com. Report 5.23.23, P. 5. Thus, a legislative body that is empowered to conduct oversight of federal immigration law and its implementation refuted the United States's claim here that there was no duty to monitor Martinez after his release to a sponsor.

In *Stalik,* a case similiar to the present matter, the Court held:

"The Government knew that this material would be transported along the public highway in this unsafe and dangerous manner. It participated in bringing about these conditions. It owed a duty to the public using the highway to so load this material that it could be safely transported along the highway. That duty did not cease when title to the property had passed to the purchaser and it had left the Government's premises, nor was the Government relieved from its duty to the public by the fact that Seiver also was negligent in not using side-boards. The uncontradicted evidence adduced by plaintiffs makes a prima facie case of negligence against the Government in loading or participating in the loading of this material in such a negligent manner. This liability to third persons continued even though Seiver was transporting the material along the highway at the time of the accident and the resulting injury." *Stalik v. United States*, 247 F. 2d 136, 139 (10th Cir. 1957). See also, https://digitalcommons.law.uw.edu/cgi/viewcontent.cgi?article=1762&context=wlr ([Government's] Duty to Warn extended to non-commercial vendor).

Here, like in *Stalik*, the government knew that the unaccompanied minor would be transported and released in an unsafe and dangerous manner. The government itself brought about these conditions inside the United States, directly exposing Kayla Hamilton to murder. It owed a duty to the public living peacefully in the State of Maryland and throughout the United States in the housing market to monitor the unaccompanied minor it took responsibility for so that both the minor and the public are alerted to and warned of danger of placement of an individual wanted on national and international criminal charges and suspicion of gang activity from one of the world's most notorious and violent gangs. This was not a remote concern – the entire world is aware and the government knew according to its own policies that the MS-13 gang requires murder in order to enter its membership. That means it knew of the suspected danger of murder and rape, and therefore had a duty to the public when it decided to admit the suspected murderer member of MS-13.

Furthermore, the government admits that it knew that failure to check national and INTERPOL background reports at the Border on presenting aliens seeking to enter the nation is a danger to U.S. citizens and a failure in its duty. The duty is axiomatic: it is a legally mandated government function to adequately check and then monitor all minors and others entering the nation regardless of administrative policy of admission and placement of unaccompanied minors throughout the country. In addition, the government admits and knows that transporting and placing unaccompanied minors close to the age of majority, as was Walter Martinez, without supervision has regularly resulted rape, criminal and gang activity that harms the citizens of the United States and the FBI and DHS list violent gangs such as MS-13 as a top priority in its

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

needed law enforcement efforts. The government therefore willfully failed and refused to protect the citizens it owed a duty to protect, resulting in the murder of Kayla Hamilton.

If the court uses a 12(b)(6) standard, the complaint specifically alleges that "Defendant owed Ms. Hamilton a special duty in light of her murderer—Martinez—having a criminal propensity as evidenced by his prior criminal history in his native El Salvador and his participation as a member of the MS-13 gang." That statement, combined with the broader context provided in the Complaint, should provide a "plausible" claim that a special relationship existed between the United States and Martinez sufficient to impose a duty on the United States to prevent harm to others. If the court instead chooses to view the motion as a motion for summary judgment, then the court should either deny the motion or defer the motion until plaintiff has had a chance to conduct discovery.

### 3. Negligent Undertaking

If the court in inclined to find that no duty existed, Plaintiff respectfully request to be allowed to amend the complaint to add a claim for negligent undertaking. Texas has a cause of action available—negligent undertaking— that could be substituted for the ordinary negligence claim. *Torrington*, 46 S.W.3d at 837; *Kristensen v. United States*, 372 F.Supp.3d 461 (W.D. Tex. 2019) ("The United States also concedes that negligent undertaking is a viable tort in Texas."). As this case originated in Maryland, plaintiff understandably did not raise this cause of action in the original Complaint. Now that venue has been decided, plaintiff should be given leave to amend.

Texas law recognizes that a duty to use reasonable care may arise "when a person undertakes to provide services to another, either gratuitously or for compensation." *Torrington*, 46 S.W.3d at 837. Every claim for negligent undertaking contemplates the recognition of a new duty that would not otherwise be cognizable under the common law. *Holcombe v. United States*, No. SA-18-CV-555-XR (W.D. Tex. Jul 06, 2021) (citing *Osuna v. S.Pac.R.R.*, 641 S.W.2d 229, 230 (Tex. 1982). This is the distinction between a claim for negligent undertaking and a claim for ordinary negligence. *Id.* To state a claim for negligent undertaking, a plaintiff must allege that (1) the defendant undertook to perform services that it knew or should have known were necessary for the protection of others; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

defendant's performance increased the plaintiff's risk of harm. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119-20 (Tex 1976). If allowed to amend to add a cause of action for negligent undertaking, that would cure any potential deficiency claimed by the United States because Texas recognizes that a person who undertakes to provide services to another owes a duty of care. And in this case, the United States argues that it owed no duty, yet still took action to investigate, screen, and place Martinez—an action that impacted public safety and ultimately led to a tragic murder. The United States knew or should have known that its actions had an impact on public safety.

## IV.     CONCLUSION

Plaintiff respectfully requests this court to permit plaintiff to conduct "jurisdictional discovery" and defer ruling on the motion to dismiss. However, with the limited information it has, plaintiff would like to point to the United States's improper attempt to apply the discretionary function exception to all of its actions. The discretionary function exception does not apply to its screen of Martinez or the implementation of policy that failed to place him in a secure facility. Furthermore, the United States was in a "special relationship" with Martinez which supports plaintiff's negligence claim. The Complaint put forth a plausible claim that the United States owed a special duty to protect plaintiff's decedent. Even under a substantive analysis, as a UAC in United States custody, ultimately placed with a sponsor, the relationship shares similarities with other situations where courts impose liability for failing to protect others. Accordingly, Plaintiff can state a claim against the United States under the FTCA and this court possesses subject matter jurisdiction.

As such, the Court should deny Defendant United States of America's motion to dismiss.

**PLEASE SEE SIGNATURES ON THE NEXT PAGE**

Docusign Envelope ID: D4A0D47B-2F20-4C0A-A7D5-C92E31227A49

Dated: June 18, 2025       Respectfully submitted,

*Brian Claypool*

Brian E. Claypool

4 E. Holly St., Suite 201

Pasadena, CA 91103

Telephone: (626) 602-1333

brian@claypoollawfirm.com

Attorneys for Plaintiff


Dated: June 18, 2025       Respectfully submitted,

*Daniel L Cox*

Daniel L. Cox

P.O. Box 545

Emmitsburg, MD

Telephone: (410) 254-7000

dcox@coxlawcenter.com

Attorneys for Plaintiff